UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>JOSE FRANCISCO VARGAS,<br><br>      Defendant. | Case No. 2:16-cr-00334-JAD-NJK<br><br>REPORT &  RECOMMENDATION<br><br>(Docket No. 17) |

This matter was referred to the undersigned Magistrate Judge on Defendant's Motion to Suppress Evidence. Docket No. 17. The Court has considered Defendant's motion, the United States' response, Defendant's reply, the evidence adduced at the evidentiary hearing on this matter, and the parties' arguments. Docket Nos. 17, 22, 25, 29.[1]

I. **BACKGROUND**

    A. **Testimony of Detective Hefner**

On November 1, 2016, at approximately 8:34 p.m., Las Vegas Metropolitan Police Department (LVMPD) Officer[2] Aaron Hefner, while operating an unmarked vehicle along with LVMPD Officer Paul Kunz, observed a black Chrysler 300 "driving erratically" southbound on Mountain Vista north of Tropicana.[3] Hearing Tr. (2/15/2017) at 1:11 - 1:12 p.m., 1:22 p.m., 1:25

---

[1] Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

[2] Although Detective Hefner is now a detective, he was a police officer at the time of the events at issue here. Accordingly, the Court refers to him as "Officer," rather than "Detective."

[3] At the time, both officers were assigned to the problem solving unit. Hearing Tr. (2/15/2017) at 1:11 p.m., 1:21 p.m. As part of their assignment, they conducted "proactive

1  p.m.; Docket No. 17-1 at 3.  The vehicle was not maintaining its lane, and was straddling the number
2  2 and 3 travel lanes, so that the dots that divide the lanes were in between the wheels of the vehicle.
3  Hearing Tr. (2/15/2017) at 1:12 p.m.  As Officer Hefner watched the vehicle, it continued to fail to
4  maintain its lane, and then made a westbound turn onto Tropicana without a signal, from a lane that
5  was not the turn lane.  Hearing Tr. (2/15/2017) at 1:12 p.m., 1:23 p.m.  The officers' vehicle was
6  about three to four car lengths behind the black Chrysler when Officer Hefner made these
7  observations, though no other vehicles were between the black Chrysler and the officers' vehicle.
8  Hearing Tr. (2/15/2017) at 1:12 p.m., 1:23 p.m.  Officer Hefner called in the plate on the vehicle,
9  which took approximately 20 seconds.  Hearing Tr. (2/15/2017) at 1:23 p.m.  Based on the traffic
10 violations that they observed, the officers conducted a traffic stop of the vehicle on Tropicana, west
11 of Mountain Vista by activating the lights and sirens on their vehicle.  Hearing Tr. (2/15/2017) at
12 1:13 p.m., 1:23 p.m.  The Chrysler pulled over immediately.  Hearing Tr. (2/15/2017) at 1:24 p.m.

13      Officer Hefner did not recognize the vehicle and, prior to stopping it, did not know who was
14 driving it.  Hearing Tr. (2/15/2017) at 1:13 p.m., 1:25 p.m.  During the traffic stop, Officer Hefner's
15 vehicle was parked two to three car lengths behind the black Chrysler.  Hearing Tr. (2/15/2017) at
16 1:13 p.m.  Both Officer Hefner and Officer Kunz exited their vehicle; Officer Hefner approached
17 the driver side of the Chrysler, and Officer Kunz approached the passenger side.  Hearing Tr.
18 (2/15/2017) at 1:13 p.m.  Officer Hefner was wearing a tactical vest that had "Police" written on it,
19 as well as a police badge.  Hearing Tr. (2/15/2017) at 1:13 p.m.

20      When Officer Hefner spoke with the driver, he realized that she was Kristal Green, who is
21 a known narcotics user and trafficker, and is someone his squad had previously come into contact
22 with and arrested.  Hearing Tr. (2/15/2017) at 1:14 p.m.  He further described Green as a "known
23 problem person in the area."  Hearing Tr. (2/15/2017) at 1:14 p.m.  She had been involved in several
24 drug-related offenses in the area.  Hearing Tr. (2/15/2017) at 1:31 p.m.  Officer Hefner has, in the
25 past, been involved in arresting Green; however, not every prior contact he has had with her resulted
26 in an arrest.  Hearing Tr. (2/15/2017) at 1:31 p.m., 1:34 p.m.  Officer Hefner did not, however,
27
28 enforcement in problem areas."  Hearing Tr. (2/15/2017) at 1:22 p.m.

1  recognize the front passenger in the vehicle (later identified as Defendant Jose Vargas). Hearing Tr.
2  (2/15/2017) at 1:14 p.m., 1:34 - 1:35 p.m.

3      Officer Hefner started asking Green the typical questions he asks during a traffic stop,
4  including where she was headed and whether she had a driver's license on her person. Hearing Tr.
5  (2/15/2017) at 1:14 - 1:15 p.m., 1:32 p.m. He noted that Green was "really, really nervous;" she
6  would not look at Officer Hefner, and her hands were shaking during the encounter. Hearing Tr.
7  (2/15/2017) at 1:15 p.m., 1:34 p.m. Officer Hefner asked Green if she had any weapons or drugs in
8  the vehicle or on her person, and Green responded that she had her license, and that she did not have
9  any drugs on her person or in the vehicle. Hearing Tr. (2/15/2017) at 1:15 p.m., 1:33 p.m. Officer
10 Hefner asked Green if there were any guns on her person or in the vehicle, and she said no. Hearing
11 Tr. (2/15/2017) at 1:20 p.m., 1:33 p.m. It took "a matter of seconds" for Officer Hefner to ask the
12 questions of Green. Hearing Tr. (2/15/2017) at 1:33 p.m.

13     Officer Hefner then asked Green to exit the vehicle based on her nervous demeanor, as well
14 as the fact that the area they were in was a "very high crime area." Hearing Tr. (2/15/2017) at 1:15
15 p.m., 1:24 p.m., 1:35 p.m., 1:46 - 1:47 p.m. His squad makes "a lot" of proactive stops and conducts
16 many investigations in that area due to "drugs, weapons, and violent crimes that occur there."
17 Hearing Tr. (2/15/2017) at 1:13 p.m., 1:46 p.m. Officer Hefner's purpose in asking Green to exit
18 the vehicle was to remove her from her vehicle in case there were any weapons or anything else
19 illegal in there, so that he could talk to her in front of the police vehicle, in a more controlled
20 environment, and to possibly conduct a patdown. Hearing Tr. (2/15/2017) at 1:15 - 1:16 p.m., 1:35 -
21 1:36 p.m. It's "normal" for Officer Hefner's squad to remove people from vehicles to talk to them.
22 Hearing Tr. (2/15/2017) at 1:36 p.m. Once Green exited the vehicle, Officer Hefner could see that
23 she was wearing very tight-fitting clothing, so he could see she did not have a weapon and never
24 patted her down. Hearing Tr. (2/15/2017) at 1:37 p.m., 1:46 p.m., 1:49 p.m.

25     At the same time that Officer Hefner asked Green to exit the vehicle, Officer Kunz asked
26 Defendant to do so as well, and Officer Hefner saw Defendant exit the vehicle. Hearing Tr.
27 (2/15/2017) at 1:16 p.m. As Officer Kunz and Defendant walked toward the officers' vehicle,
28 Officer Hefner heard Officer Kunz tell Defendant several times to stop reaching in his pockets.

1    Hearing Tr. (2/15/2017) at 1:16 p.m.  Hearing Officer Kunz tell Defendant to stop reaching in his
2    pockets raised a red flag, so Officer Hefner made sure to look over to see what was happening.
3    Hearing Tr. (2/15/2017) at 1:37 p.m.  Officer Hefner looked over and saw Defendant fidgeting and
4    moving his hands toward his pockets.  Hearing Tr. (2/15/2017) at 1:16 p.m.  Officer Hefner saw
5    Defendant's hands in his front pocket area while Officer Kunz told him not to reach in that area.
6    Hearing Tr. (2/15/2017) at 1:37 p.m.  After Officer Kunz told Defendant two to three times to stop
7    moving his hands toward his pockets, he told Defendant to put his hands behind his back because
8    Officer Kunz was going to pat him down for weapons.  Hearing Tr. (2/15/2017) at 1:17 p.m.  At this
9    time, the officers did not know if Defendant was a felon, or if he had a license to carry a concealed
10   weapon (CCW).  Hearing Tr. (2/15/2017) at 1:39 p.m.

11        After Officer Kunz told Defendant he was going to pat him down, Officer Hefner heard
12   Defendant say, "This is illegal.  You can't do that.  I have my protection in there."  Hearing Tr.
13   (2/15/2017) at 1:18 p.m., 1:39 p.m.  Officer Hefner heard Officer Kunz ask Defendant what he meant
14   by his protection, and he heard Defendant respond that he had a gun.  Hearing Tr. (2/15/2017) at 1:18
15   p.m.  When Defendant made this comment, Officer Kunz was holding onto his hands behind his
16   back, but had not yet started to conduct the patdown.  Hearing Tr. (2/15/2017) at 1:18 - 1:19 p.m.
17   Defendant was detained, but not under arrest at this point.  Hearing Tr. (2/15/2017) at 1:19 p.m.
18   Officer Hefner saw Officer Kunz reach into Defendant's pocket and remove a small loaded revolver.
19   Hearing Tr. (2/15/2017) at 1:19 - 1:20 p.m.  Prior to Officer Kunz removing the firearm, it was
20   concealed on Defendant's person.  Hearing Tr. (2/15/2017) at 1:19 p.m.  Approximately three to five
21   minutes elapsed from the time of the initial stop to the time the firearm was found on Defendant's
22   person.  Hearing Tr. (2/15/2017) at 1:40 p.m.

23        Another unmarked unit, with two officers, arrived at the scene shortly after Officers Hefner
24   and Kunz had Defendant and Green exit their vehicle.  Hearing Tr. (2/15/2017) at 1:26 p.m., 1:29
25   p.m., 1:36 p.m., 1:44 p.m.[4]  By the time the second unit arrived on the scene, the firearm had been

---

[4] Officer Hefner did not call for the second unit, but it was typical in that squad for a backup unit to arrive on scene when it was broadcast over the radio that someone from the squad was making a traffic stop.  Hearing Tr. (2/15/2017) at 1:30 p.m.

recovered and Defendant was in cuffs. Hearing Tr. (2/15/2017) at 1:29 p.m. After the firearm was found, the officers handcuffed Defendant, secured the firearm and photographed it, and spoke with the other officers on the scene prior to notifying dispatch that they had a male in custody. Hearing Tr. (2/15/2017) at 1:41 p.m. They also informed dispatch that all officers were safe. Hearing Tr. (2/15/2017) at 1:41 p.m.

Officer Hefner is fluent in the Spanish language, and is a department-certified translator. Hearing Tr. (2/15/2017) at 1:20 p.m. He currently translates approximately three to four times per day. Hearing Tr. (2/15/2017) at 1:21 p.m. Officer Hefner spoke to Defendant in English, and noted that Defendant understood English to the extent that he did not need to speak to Defendant in Spanish. Hearing Tr. (2/15/2017) at 1:38 p.m.

**B.     Testimony of Officer Kunz**

On November 1, 2016, at approximately 8:30 p.m., LVMPD Officer Paul Kunz was on duty in an unmarked vehicle with his partner Officer Hefner traveling southbound on Mountain Vista approaching Tropicana. Hearing Tr. (2/15/2017) at 1:51 - 1:52 p.m., 2:11 p.m. Officer Kunz observed a black Chrysler traveling westbound on a residential street make a southbound turn onto Mountain Vista. While traveling southbound on Mountain Vista, the vehicle straddled lanes 2 and 3, with wheels in each lane as it drove. Hearing Tr. (2/15/2017) at 1:52 - 1:53 p.m., 2:12 - 2:13 p.m. The vehicle then made a westbound turn onto Tropicana without using a signal. Hearing Tr. (2/15/2017) at 1:53 p.m., 2:13 p.m. The officers were approximately two to three carlengths behind the vehicle when Officer Kunz made these observations. Hearing Tr. (2/15/2017) at 1:53 p.m. The officers made the turn onto Tropicana, called in to the radio, and conducted a traffic stop, with lights and siren, of the vehicle in front of the Q-Mall shopping center due to the traffic violations. Hearing Tr. (2/15/2017) at 1:53 - 1:54 p.m., 2:14 p.m.[5] The officers were not in uniform, but each was wearing a tactical vest with "Police" on it, as well as an LVMPD badge and patch. Hearing Tr. (2/15/2017) at 1:54 p.m. During the stop, the officers' vehicle was parked approximately 15 feet behind the black Chrysler. Hearing Tr. (2/15/2017) at 1:54 p.m.

---

[5]Officer Kunz did not recognize the vehicle and, prior to conducting the stop, did not know who was inside. Hearing Tr. (2/15/2017) at 1:55 - 1:56 p.m., 2:15 p.m.

1    Both officers exited the vehicle quickly, and Officer Kunz approached the passenger side of
2 the vehicle while Officer Hefner approached the driver's side. Hearing Tr. (2/15/2017) at 1:55 p.m.,
3 2:15 p.m. When he approached, Officer Kunz observed Defendant in the front passenger seat of the
4 vehicle, and did not recognize him as someone he had seen before. Hearing Tr. (2/15/2017) at 1:55 -
5 1:56 p.m. Officer Hefner told Officer Kunz that Green was the driver, and Officer Kunz looked into
6 the vehicle, because he could not see the driver from his vantage point. Once he looked inside,
7 Officer Kunz recognized Green as someone he had dealt with numerous times in the past. Hearing
8 Tr. (2/15/2017) at 1:55 p.m.

9    Officer Kunz asked Defendant if there were any weapons or narcotics in the vehicle. Rather
10 than responding to Officer Kunz's questions, however, Defendant looked straight ahead with his
11 hands in his lap. Officer Kunz noticed that Defendant was shaking. Hearing Tr. (2/15/2017) at 1:56
12 p.m., 2:16 - 2:17 p.m. During this time, Officer Kunz was standing to the right side of Defendant,
13 at the window. Hearing Tr. (2/15/2017) at 1:57 p.m. Officer Kunz also asked Defendant for his
14 identification. Defendant still failed to acknowledge the officer, and continued to look straight
15 ahead. Hearing Tr. (2/15/2017) at 1:57 p.m., 2:16 p.m. Approximately three to four minutes after
16 the vehicle was stopped, Officer Hefner told Officer Kunz he was going to have the driver step out
17 of the vehicle, and Officer Kunz then asked Defendant to step out of the vehicle. Hearing Tr.
18 (2/15/2017) at 1:58 p.m., 2:17 p.m. Officer Kunz did not want to walk away from the vehicle while
19 Defendant was inside, particularly considering that Defendant had not answered his question
20 regarding weapons. He wanted Defendant to be visible, and to not have access to any weapons that
21 may be in the vehicle while the officers were with the driver at their vehicle. Hearing Tr.
22 (2/15/2017) at 1:58 - 1:59 p.m.

23    When Officer Kunz asked Defendant to step out of the vehicle, he did so. Hearing Tr.
24 (2/15/2017) at 1:59 - 2:00 p.m., 2:18 p.m. Officer Kunz then told Defendant to keep his hands where
25 the officers could see them and not to reach in his pockets. Hearing Tr. (2/15/2017) at 1:59 p.m.,
26 2:19 p.m., 2:22 p.m. When Officer Kunz asked Defendant to step out of the vehicle, he intended to
27 take him to the officers' vehicle and ask for consent to conduct a patdown. Hearing Tr. (2/15/2017)
28

1  at 2:00 p.m., 2:19 p.m., 2:31 p.m.[6] As they walked next to each other toward the officers' vehicle,
2  however, Defendant walked with his hands at his sides and then moved them toward the front
3  pockets of his jeans. Officer Kunz told Defendant to stop and not reach toward his pockets.
4  Defendant then put his hands down at his sides again. As they continued walking, Defendant
5  reached toward his front jeans pockets again. Officer Kunz told Defendant to stop again, and he put
6  his hands down, then reached for his front jeans pockets again. Officer Kunz told Defendant three
7  times not to reach for his pockets and, when he continued to do so, Officer Kunz grabbed his hands
8  and held them to his sides because he did not want Defendant to pull a weapon. Hearing Tr.
9  (2/15/2017) at 2:00 - 2:04 p.m., 2:19 - 2:20 p.m. At this point, Defendant's actions in repeatedly
10 reaching toward his pockets despite instructions not to do so caused Officer Kunz concern for officer
11 safety. Hearing Tr. (2/15/2017) at 2:03 p.m., 2:19 p.m., 2:34 - 2:35 p.m.

12         Officer Kunz then escorted Defendant to the front of the officers' vehicle and directed him
13 to stand for a patdown with his feet spread and his hands behind his back. Hearing Tr. (2/15/2017)
14 at 2:05 p.m., 2:22 p.m. Officer Kunz held Defendant's hands behind his back with one of the
15 officer's hands, and used his free hand to check the small of Defendant's back for any weapons.
16 Hearing Tr. (2/15/2017) at 2:05 p.m., 2:23 p.m.[7] Defendant then told Officer Kunz this was illegal
17 and the officer could not search him. Hearing Tr. (2/15/2017) at 2:05 p.m., 2:29 p.m. Defendant
18 then said, "You can't go there. I have my protection there." Hearing Tr. (2/15/2017) at 2:05 p.m.,
19 2:29 p.m. Officer Kunz asked Defendant what he was talking about and Defendant motioned his
20 head toward his front right pants pocket. Hearing Tr. (2/15/2017) at 2:06 p.m. Officer Kunz asked
21 Defendant what his protection was, and Defendant said it was a gun. Hearing Tr. (2/15/2017) at 2:06
22 p.m. Officer Kunz asked Defendant if he had a permit to carry a concealed weapon, and Defendant

---

[6] If Defendant had refused to give consent for a patdown at that point, Officer Kunz would have had him sit on the curb with an officer next to him for the duration of the traffic stop. Hearing Tr. (2/15/2017) at 2:33 p.m.

[7] The officers from the second unit to arrive on the scene had arrived and were walking up to where Officers Hefner and Kunz were as Officer Kunz began the patdown. Hearing Tr. (2/15/2017) at 2:23 p.m. The officers had driven up in an unmarked vehicle, parked in the shopping center parking lot, and walked to where Officer Hefner had parked his vehicle. Hearing Tr. (2/15/2017) at 2:24 p.m. These officers were also wearing tactical vests. Hearing Tr. (2/15/2017) at 2:24 p.m.

1   said, "No. You can talk to my attorney." Hearing Tr. (2/15/2017) at 2:06 p.m., 2:30 p.m. Defendant
2   refused, however, to give the officers the name of his attorney. He also refused to identify himself.
3   Hearing Tr. (2/15/2017) at 2:06 - 2:07 p.m.

4   At this point, the backup unit had arrived. Officer Kunz asked Officer Angulo to come near
5   him. As he did, Officer Kunz continued his patdown of Defendant. When he came to Defendant's
6   front right pocket, he felt what he immediately recognized as a revolver. Officer Kunz removed the
7   revolver from Defendant's pocket and handed it to Officer Angulo. Hearing Tr. (2/15/2017) at 2:07
8   p.m., 2:19 p.m. Once the revolver was removed from Defendant's pocket, Defendant was under
9   arrest. Hearing Tr. (2/15/2017) at 2:07 p.m., 2:30 p.m. Defendant refused to identify himself, and
10  told officers they could speak to his attorney, whom he also refused to identify. Hearing Tr.
11  (2/15/2017) at 2:08 p.m., 2:10 p.m. Defendant was handcuffed and transported to the Clark County
12  Detention Center, where his fingerprints were run in order to ascertain his identity. Hearing Tr.
13  (2/15/2017) at 2:10 p.m.[8]

14  On November 16, 2016, a federal grand jury sitting in Las Vegas, Nevada issued an
15  indictment charging Defendant with one count of Illegal Alien in Possession of a Firearm, in
16  violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(2), and one count of Felon
17  in Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and
18  924(a)(2). Docket No. 1. On December 22, 2016, Defendant filed the instant motion to suppress
19  evidence, asking the Court to suppress all evidence seized during the traffic stop. Docket No. 17.
20  Defendant also requests an evidentiary hearing. *Id*. at 8.

21  **II.    ANALYSIS**

22  **A.    Credibility of Witnesses**

23  The Court ordered an evidentiary hearing in order to make an accurate determination of what
24  occurred in the instant case and how the facts relate to the applicable caselaw. "The longstanding
25  and repeated invocations in caselaw of the need of district courts to hear live testimony so as to
26  further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live

---

[8]The driver, Green, was not arrested as a result of the traffic stop. She was, however, cited for traffic violations. Hearing Tr. (2/15/2017) at 2:28 p.m.

1 testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684
2 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth
3 on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their
4 veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation
5 omitted). *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary
6 hearing required where defendant demonstrates that a significant disputed factual issue exists);
7 *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a
8 witness testify live assists the finder of fact in evaluating the witness's credibility").

9 During the evidentiary hearing in this matter, the Court had the opportunity to listen to the
10 testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to
11 weigh each witness' credibility. Having done so, the Court finds that both Detective Hefner and
12 Officer Kunz testified credibly.

13      **B.     Motion to Suppress**

14           **1.     Traffic stop**

15 Defendant submits that officers unlawfully detained him when they conducted the traffic stop
16 at issue based on "vague allegations of 'erratic driving.'" Docket No. 17 at 6-7. As a result,
17 Defendant submits that all fruits of the traffic stop must be suppressed. *Id*. He contends that the
18 arrest report's use of the terms "driving erratically" and "straddling" lanes does not make clear the
19 nature of the traffic violations for which the car was stopped. *Id*. at 7. Further, Defendant submits
20 that, though the arrest report states the vehicle made a turn without signaling, it is silent regarding
21 the officers' position in relation to the vehicle, how long the officers observed the vehicle before
22 stopping it, whether it turned from a turn-only lane, or "any other details that would allow this Court
23 to determine whether the officers' bare conclusion is credible." *Id*. Therefore, Defendant submits
24 that the stop was not lawful, and all fruits of it should be suppressed. *Id*.

25 In response, the United States submits that the officers observed Green driving erratically,
26 and that they also observed her violate NRS 484B.413 by turning across a lane of traffic without
27 signaling. Docket No. 22 at 5. Once officers observed the NRS violation, the United States submits,
28 reasonable suspicion that a crime had been committed existed for them to conduct the initial traffic

- 9 -

1  stop. *Id*.

2  In reply, Defendant does not reiterate his argument that the traffic stop was unlawful. *See*
3  Docket No. 25. He refers to the traffic stop only tangentially, stating that, "if the initial seizure of
4  the vehicle was lawful, Officer Kunz was permitted to order him out of the car." *Id*. at 2.

5  The Fourth Amendment to the United States Constitution guarantees "[t]he right of the
6  people to be secure in their persons, houses, papers, and effects, against unreasonable searches and
7  seizures." "Because stopping an automobile and detaining its occupants, 'even if only for a brief
8  period and for a limited purpose,' constitutes a 'seizure' under the Fourth Amendment, an official
9  must have individualized 'reasonable suspicion' of unlawful conduct to carry out such a stop."
10 *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (internal citations omitted). An
11 investigative traffic stop requires reasonable suspicion, not probable cause. *United States v. Twilley*,
12 222 F.3d 1092, 1095 (9th Cir. 2000); *United States v. Lopez–Soto*, 205 F.3d 1101, 1104–05 (9th Cir.
13 2000). "Reasonable suspicion is formed by specific, articulable facts which, togehter with objective
14 and reasonable inferences, form the basis for suspecting that the particular person detained is
15 engaged in criminal activity." *Twilley*, 222 F.3d at 1096. "[T]he constitutionality of a traffic stop
16 does not depend on the subjective motivation or intent of the officers." *United States v. Wallace*,
17 213 F.3d 1216, 1219 (9th Cir. 2000) (internal citation omitted). Therefore, "[t]he fact that the
18 alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances
19 justify the stop." *Id*.

20 A passenger "may challenge a stop of a vehicle on Fourth Amendment grounds even if []he
21 has no possessory or ownership interest in the vehicle." *Twilley*, 222 F.3d at 1095 (internal citation
22 omitted). Further, a passenger who establishes that the initial stop of the car violated the Fourth
23 Amendment can suppress evidence seized as a result of that stop as "fruit of the poisonous tree."
24 *Id*.

25 In the instant case, the officers observed the vehicle in which Defendant was a passenger
26 driving erratically by straddling the number 2 and 3 travel lanes. The vehicle then made a turn
27 without signaling its intention to do so, therefore violating Nevada law. Docket No. 17-1 at 3.
28 These facts clearly give the officers reasonable suspicion to believe that traffic laws had been

- 10 -

violated. Therefore, the Court finds that the stop was reasonable within the meaning of the Fourth Amendment.

### 2. Order to Exit Vehicle

The parties agree that, if the traffic stop was lawful, Officer Kunz was permitted to order Defendant to exit the vehicle. *See* Docket Nos. 17, 22, 25.

When "a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment, ... because the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Arizona v. Johnson*, 555 U.S. 323, 325 (2009). *See also Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (internal citation omitted) (an officer "may as a matter of course order the driver of a lawfully stopped car to exit his vehicle...."); *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005) (citing *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)) ("it is well established that an officer effecting a lawful traffic stop may order the driver and the passengers out of a vehicle").

The Court has found that the traffic stop was lawful. The Court, therefore, agrees with the parties that Officer Kunz properly ordered Defendant to exit the vehicle. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009).

### 3. Patdown

Defendant submits that, even if the traffic stop was reasonable, Officer Kunz did not have reasonable suspicion to believe that Defendant was armed and dangerous when he decided to pat him down. Docket No. 17 at 3. Defendant contends that the only facts available to the officer at the time he ordered the patdown were his nervousness and Green's traffic violations and prior drug use, which he submits are not sufficient to establish reasonable suspicion. *Id*. Further, Defendant submits that the order to place his hands behind his back for the patdown was "'more intrusive than necessary' and therefore violated the Fourth Amendment." *Id*. Additionally, Defendant submits that the additional statements Defendant made cannot be used to establish reasonable suspicion, but that in any event, they do not give rise to reasonable suspicion that he was engaged in criminal activity or was armed and presently dangerous. *Id*. at 3-4. Finally, Defendant contends that the officers

- 11 -

1   violated his Fourth Amendment rights by "effecting a seizure more intrusive than necessary to
2   accomplish the underlying purpose of the stop" and, therefore, all evidence seized as a result of it
3   should be suppressed. *Id*. at 6-8.

4         In response, the United States submits that, prior to exiting the vehicle, Defendant refused
5   to answer basic biographical questions asked of him by one of the officers, failed to make eye contact
6   with the officer, and further failed to answer when asked if there was a gun in the car. Docket No.
7   22 at 6, 9. The lack of response and failure to make eye contact, the United States contends, created
8   reasonable suspicion that he was armed and dangerous. *Id*. at 7, 9. The United States further
9   submits that traffic stops are dangerous for police officers. *Id*. at 7.

10        In reply, Defendant submits that the United States fails to indicate what biographical
11  questions he failed to answer, or whether he gave any explanation for declining to answer them.
12  Docket No. 25 at 4.

13        A patdown of a person for weapons requires reasonable suspicion that the person "is armed
14  and presently dangerous to the officer or to others." *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir.
15  2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)). "[T]he purpose of a *Terry* stop is to allow the
16  officer to pursue his investigation without fear of violence." *United States v. Miles*, 247 F.3d 1009,
17  1012 (9th Cir. 2001) (internal quotations omitted). "A lawful frisk does not always flow from a
18  justified stop." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). To the contrary, each
19  element, "the stop and the frisk, must be analyzed separately, the reasonableness of each must be
20  independently determined." *Thomas*, 818 F.3d at 876.

21        In order to establish reasonable suspicion that a person is presently armed and dangerous for
22  the purpose of justifying a patdown, "the police officer must be able to point to specific and
23  articulable facts which, taken together with rational inferences from those facts, reasonably warrant
24  that intrusion." *Id*. (quoting *Terry*, 392 U.S. at 21). "A mere inchaoate and unparticularized
25  suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion."
26  *Id*. (internal citation omitted).

27  . . . .

28  . . . .

To determine whether reasonable suspicion existed at the time of the patdown, a Court considers the "totality of the circumstances surrounding the stop." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010). "Reasonable suspicion is an objective standard, asking whether a reasonably prudent person would have been warranted in believing the suspect was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." *Thomas*, 818 F.3d at 876.

Reasonable suspicion to justify a patdown or frisk is analyzed objectively under the "totality of the circumstances surrounding the stop," and in light of the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (quoting *United States v. Hall*, 974 F.2d 1201, 1204 (1992)). The crime of which the person is suspected is relevant, as can be the location and time of day. *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) (finding relevant the fact that the frisk occurred "on a remote section of road at midnight" and was of a nighttime burglary suspect). Other factors that have been found relevant include nervous or aggressive behavior, bulges in an individual's clothing, and association with gang members or other criminals. *See Tuttelman v. City of San Jose*, 420 Fed.Appx. 758, 761 (9th Cir. 2011) (citing cases); *United States v. Montes*, 343 Fed.Appx. 288, 288 (9th Cir.2009). Additionally, although "a prior criminal history alone cannot establish reasonable suspicion ... it is permissible to consider such a fact as part of the total calculus of information." *Burrell v. McIlroy*, 464 F.3d 853, 858 n. 3 (9th Cir. 2006).

A seizure for a traffic violation "justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' ... than to a formal arrest." *Id*. (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998). *See also Arizona v. Johnson*, 555 U.S. at 330. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop" and to "attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614. "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States*

1  *v. Sharpe*, 470 U.S. 675, 686 (1985).  Ultimately, the analysis remains one of reasonableness, and
2  thus the court must examine the "totality of the circumstances" surrounding the stop to determine
3  whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir.2008).
4        Here, the Court finds that Officer Kunz had reasonable suspicion to believe that Defendant
5  was armed and presently dangerous, such that his patdown of Defendant was lawful.  The stop
6  occurred at night, when it was dark outside.  After the vehicle was stopped, Officer Kunz approached
7  the passenger side and attempted to speak with Defendant.  Defendant refused to even look at him,
8  instead staring straight forward and refusing to acknowledge the officer's questions.  Additionally,
9  Defendant appeared nervous, as his hands were shaking.  When Officer Kunz asked Defendant to
10 walk toward his vehicle, he specifically told Defendant to keep his hands visible and not reach for
11 his pockets.  Despite those clear instructions, Defendant reached for his front pockets on three
12 separate occasions for an object that was not visible, causing Officer Kunz to fear for officer safety.
13 "A wide variety of factors support a reasonable belief that an individual is armed and dangerous,"
14 including "an officer's observation of a visible bulge in an individual's clothing; sudden movements
15 or repeated attempts to reach for an object not immediately visible; and the nature of the suspected
16 crime."  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (internal citations
17 omitted).  The Court finds, looking at the totality of the circumstances, that a reasonably prudent
18 person in Officer Kunz's position would have been warranted in believing Defendant "was armed
19 and thus presented a threat to the officer's safety." *Thomas*, 818 F.3d at 876.
20       Further, although a lawful detention "can become unlawful if it is prolonged beyond the time
21 reasonably required to complete th[e] mission" of the stop, *Illinois v. Caballes*, 543 U.S. 405, 407
22 (2005), there is nothing in the record to suggest the officers detained Defendant longer than the
23 amount of time reasonably necessary to complete the mission of this stop.  Indeed, the officers'
24 testimony and dispatch documents demonstrate that everything occurred within a matter of minutes.
25 . . . .
26 . . . .
27 . . . .
28 . . . .

## III. CONCLUSION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's Motion to Suppress Evidence (Docket No. 17) be **DENIED**.

DATED this 3rd day of March, 2017.

_____
NANCY J. KOPPE
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).